The clerk will call the case, please. And the counsel will step up, please, and introduce yourself. Good morning. Assistant State Attorney Joan Frazier on behalf of the people. Good morning. Thomas Bransfeger on behalf of Christopher Jackson. Thank you. Counsel, begin. I'm going to just point out, I don't know if you were here when I said these microphones do not amplify, they just record. So the people in the back row can't hear a word you're saying unless you speak up. May it please the Court. My name is Thomas Bransfeger. I represent Christopher Jackson before this Honorable Court. I will also note that the initial brief was filed by the State Appellant Defender, raising the issue that I find most significant in a review of this record, and that is the excessive sentence. Since the death penalty has been taken away from the sentencing court's consideration, the sentence received by Mr. Jackson is the most significant that a trial court can render. It deprives one of liberty forever. There is no doubt and there will be no argument that the facts of this case call for punishment. There is no argument that a murder was committed and Mr. Jackson was found guilty of it. But it is our position that the sentence imposed, even on these facts, was excessive. And not to skip to the end of my argument, but I feel it's important, when the Court considers the record of the sentencing hearing, what Judge Joyce said, I almost don't want to do it. This sentence, this life sentence, this most serious and significant sentence, should only be rendered, should only be imposed upon a strong conviction that the facts and the aggravation and what mitigation there is calls for it. There must be a firm conviction that the person being sentenced to life in prison is irredeemable, that there is no hope that he or she cannot be rehabilitated. What case says that? I say it. That's not the law. It's my argument, that it is the worst sentence, now that we don't have the death penalty, that one can impose, and it should only be imposed in the worst of cases. Unfortunately, courts have not given greater weight to a defendant's rehabilitative potential than they've given to how serious the crime is. That's correct, Judge. I understand that. But nevertheless, it's our argument that, and I came up with thinking, I'm not even sure this is the correct argument, but if Ms. Gonzalez had been killed, Mr. Jackson would have gotten the same sentence. It would have been two murders. He would have gotten the same sentence. But I can only go back to Judge Joyce's comment, and he said that he balanced the seven factors or the six factors that were presented to him about mitigation for Mr. Jackson, that he was employed, that he had a family, that he tried to educate himself, that he took care of his kids. He had a criminal background, almost all of it due to alcohol. He had a significant alcohol problem. He testified he drank a 12-pack a day for 12 years. That's an alcohol problem. It's also a mental problem. And Judge Joyce stated on the record he took that. Well, the mental problem the court found in the sentencing, that there was not a mental problem with regard to the trial or his sentencing. It was not, and that goes to another argument that was raised, and the mental problems presented to the court, it's not always just about fitness. It goes to affirmative defenses. It goes to defense theories. It goes to whether you should advise your client whether he should testify or not. And I think a review of this record indicates, and I understand it's the defendant's right to get up there and say what he wants to say, but had appointed counsel known or at least shown that he had known some of these past problems that Mr. Jackson had, maybe there would have been a stronger indication. Maybe it's not a good idea to get another stand. How do we know that he didn't? We don't know that he did. We don't know. He never raised any factor. We don't know if he knew or he didn't know. But prior counsel, therefore, it's a speculation. It's no speculation that he never raised it in any way, shape, or form. That's not speculation, but it's speculation to say that he didn't know about it. It is not speculation to know that Mr. Jackson did have an alcohol problem, had taken psychotropic medication on him before the trial, and had at least one time been in a mental hospital for a breakdown. And the counsel might have known all that. We don't know. There's nothing in the record to show that the counsel did not know those things. Then our issue about whether he had a duty to investigate, by talking to his clients, by saying, geez, have you ever been hospitalized? You say he drank 12 packs a day for 12 years. Did he ever go to AA? Maybe he did. We don't know. It's just a conjecture that whether he asked those questions or not. Well, I understand that. But our position is the fact that it was not raised and subsequent counsel was able to convince the court to order a fitness examination indicates that those are facts that should have been known. The trial attorney has a duty to investigate, and not just to take the police reports and say, okay, I'm ready for trial. But he has a duty to investigate. Again, we don't know that. The presumption is, on an ineffective assistance claim, that trial counsel was competent. And we don't know that his defense counsel didn't say, are there any factors I should know about? Do you have any problem with drugs? Do you have any problem with alcohol? Have you ever been treated? I mean, these seem like normal questions that defense counsel would ask. And what you're asking us to do is to presume that they weren't asked. I don't think we can do that. But the facts that got on the record prior to sentencing from second counsel, those just didn't all arise between the finding of guilt and the sentencing date. Those were things that Mr. Jackson lived with. If you're going to put someone on the witness stand, should you ask them, have you ever been in a mental hospital? Do you drink too much? Do you ever go get help? Those are questions we don't have to speculate on. Those are questions that should be asked. If you're going to prepare your client to get on the witness stand, take a note to tell the truth. Again, we don't, and he was not cross-examined on any of those matters. We don't know that defense counsel did not explore that with his client. I understand and accept the fact that maybe this issue is raised better in a post-conviction petition. However, because it's in the sentencing record, and it was raised by the sentencing counsel, it is incumbent upon us to raise the fact that if these issues did exist prior to trial, and they did, he was in the hospital when he was a teenager and drank for 12 years, those are issues that should have been explored and that counsel had a duty to investigate prior. Mr. Jackson was how old? 35, I believe. So he was hospitalized for two months when he was 14. Correct. But was taking psychotropic medication well into his 30s. Took it in the Cook County Jail. They gave it to him. So he was on it. That's a question everybody has to ask. Are you on any medication? That gets asked at the bond hearing. But that fact, that environment, the judge knowing that when he renders the most significant sentence, we understand there is a requirement under the law that a person who commits a crime as foul as murder must be punished. We also believe there should be a balance. And we do not believe, despite Judge Joyce's saying, oh, I considered everything, that there's no balance expressed. And our position is, and with all due respect, that the fact that Judge Joyce said, I really don't, I almost don't want to do it, leads us to believe that it was not based on a strong conviction that this was an individual. If Judge Joyce had said, I am convinced that a sentence of natural life is the only appropriate sentence, having balanced all the factors, then you would have no issue. Well, maybe not one that would be cognizable to the court. So when a judge imposing, as you say, the most serious sentence, expresses some hesitation about doing it, as I would expect most judges would, that then dooms the sentence? Is that what we should think? It doesn't doom it, Judge. The minimum sentence on this case would make Christopher Jackson 77 years old when he's released. It's not, it's, there was a sentence that would have covered all the basics, covered all the requirements of punishment, of the most serious offense that someone could commit,  Well, didn't the judge also say, wait a minute, hold the presses, this man has been abusive to her two times in the past and now this time, and oh, by the way, he also murdered somebody. So the judge specifically said, I don't want her to have to worry about this guy crawling in her bedroom window again. And he's already shown that he's not going to stop bothering her. Our only answer is that he was being, he was given life on a murder case. And I understand that that's what Judge Joyce said, and he kind of combined the two fact situations, the attempted murder and the murder. But we're discussing penalties for murder. And again, 70, getting out when you're 77, 78 years old, I don't think Ms. Gonzalez had to worry about seeing him come through the window again. On the other hand, It would cover the problem. Did the judge just say it was an incredible night of terror? It was. And I agree with Justice Mason that any judge who is giving the maximum of life is going to think twice about it. And I think Judge Joyce is expressing whatever, what you want to hear a judge say is that, you know, I'm thinking very, I've thought very hard about this. It's a very difficult decision to make. And I think that's what the judge is expressing in his statement that it's a difficult decision to do. But under this case, under these facts, it was the right decision for him to make. And it's very difficult for us, as you know, to undo that sentence. I understand that, Judge. And I don't for a second doubt Judge Joyce's sincerity in this. No, I didn't. It's just our position that when he does express that difficulty in imposing a sentence that can't be undone and the person is finished, he's going to spend the rest of his life in a cage, then we only ask it should be done with a firmer conviction. So you would say that when the sentencing judge expresses any hesitation about imposing the maximum sentence, that per se is an abuse of discretion because the judge has to find that the defendant is irredeemable in order to impose the maximum. I do not say that it's per se, Judge. I say on these facts. Other than Judge Joyce's comment, do we have any basis to say this is an abuse of discretion? If we consider the several factors of mitigation that were presented to Judge Joyce. And so we're clear, so I'm clear. Murder is never anything chaotic, other than chaotic and horrible and obviously so final. And I know the argument was made in the state public defender's brief about the fact that Mr. White, based on the facts and the medical examiner, probably died instantly. Doesn't make it any better. It's just that when in the realm of murder cases, there are a lot worse. And it's a difficult argument to make because one loses his life either way. But nevertheless, for sentencing purposes, it can't be considered the worst murder case Judge Joyce will ever see or has ever seen. And it is not a situation where the person in front of him hasn't shown any spark of civility or citizenship or taken care of others in his whole life. That's not true. That's not Mr. Jackson. He's done what he could with his limited circumstances. He's gone to school. He's had a job. He's taken care of his kids. And he expressed remorse only after the state pointed out that he never did. I understand that. And, again, I can only take the position of my client in a courtroom about to lose his liberty forever. I'm not sure what else he can do other than say it. And then he puts the blame on the victims. I mean, I think the judge – I can't argue that fact with the court. His remorsefulness was not articulate. And, again, to repeat myself, we only ask the court to consider the fact that in this most extreme of sentences, that the conviction or the desire or the facts to impose it are firm and without doubt. The other issue I'd like to raise is the enhancement issue on the attempted murder case. And I will make it brief. The brief submitted sets out the argument. But in response to the state's brief, we find that the enhancement was improperly imposed. If you look at the indictment as a whole, for every count that could have raised the enhancement, they put the language in except for the attempted murder. And we're asking the court to find that when you are going to seek a greater sentence than the statute might allow, that the defendant be given notice prior to trial that this is what he's looking at, so that he can make the intelligent choices about how to proceed to trial or to plead guilty, whether to testify, whether not to testify. And the difference in language is the enhancement statute is while armed with a firearm. And the indictment in this case was that he discharged a firearm. Pulled the trigger. Pulled the trigger. Pulled the trigger. You have to have a firearm in order to pull the trigger. And I understand that the MIMS case is a problem for us. However, and I didn't have the opportunity to look at the MIMS indictment every count, but a simple reading of our indictment indicates that when they wanted the enhancement, they put the proper language in. But in the attempted murder, they didn't. Therefore, the enhancement, there was no notice of the enhancement. He knew he was getting enhanced. He was told before trial when the death penalty went off the table, we're going to be seeking life in prison on the murder charge. And I've said, and if somehow you're found not guilty of the murder charge, we're going to seek an enhancement on the attempted murder. And although, you know, you meet a notice of respect, you almost get a headache reading back and forth about notice and what should be given notice and what and how notice is given. It doesn't seem all that difficult when they do it on two of the counts or the murder count and even the home invasion count, but don't do it on the attempted murder count when it should have been done. Unless there's any other questions, we'll rest on our briefs. Thank you. Thank you. Good morning. Assistant State Attorney Joan Fraser on behalf of the people. With regard to the sentence and sentencing issue, the sentence was appropriate under either alternate statutes because it was, A, a felony murder since the murder was committed in the course of a home invasion, or, B, as a firearm sentencing enhancement, which was from 25 years to natural life. The important point is that the sentence was in the statutory guidelines. Defendant has failed to show that it departed from the intent of the law or violated any constitutional guidelines. There's a presumption, in fact, that a sentence is based on proper legal reasoning. And here the judge made a very good record going through all the factors. The judge was aware of what defendant now presents as rehabilitation factors. The fact of the matter is defendant doesn't have much to rehabilitate. He came from a good home. He was employed. He had an education. The issue about his mental health, just to be clear on that, he was, as a youth, he was treated for several months for some kind of mental health disorder, but he didn't take medication from then until he committed the crime when he was in his 30s. After he was arrested, he was diagnosed as bipolar and schizophrenic, and he was given Zoloft and Klonophor, I think it's called. But then after trial, when he was examined by Forensic Clinical Services, they found that he was fit for trial, and he didn't even need to take his psychotropic medications in order to retain his fitness. So I'll talk a little bit more about the mental health issue in a moment, but there's not much to rehabilitate. Here's someone who alcohol was mentioned. Maybe he did some drinking in the past, but he testified at trial that he was not drunk when this thing unfolded, even though he'd been drinking earlier in the evening. That was his testimony. The issue of remorsefulness. There's not much to say, just as he had not much to say. He didn't mention he never took responsibility for it. He testified at trial. He gave a convoluted story about being attacked by people who demonstrably were not available, and it was not until the state said at sentencing he's never shown any remorse that he very briefly said, I'm sorry. So that's one of the factors. And with regard to rehabilitation, as the court pointed out, that doesn't outweigh the question of the seriousness of the offense. And this one is just about as serious as it gets. Honestly, the argument in the brief about excessive sentencing, this was not particularly cruel, was really rather offensive. Here's a man who was shot twice in the head. So to say there's worse things that could happen, I doubt his family feels that way, and I doubt if he could speak he would feel that way. That would speak to a maximum sentence in most instances. And courts do distinguish the circumstances from case to case. For example, if the victim was tortured prior to being murdered, or whether there was an extensive, particularly heinous method of murder, if two shots to the head, as serious as they are and as devastating as they are, are enough for a maximum sentence, it would seem to me that every murder is a maximum sentence, or you can justify a maximum sentence in every murder. Well, it's not just that. First of all, of course, as the court knows, the court could exercise its discretion to decide where within those guidelines this crime fit. Yes, it's an aggravating factor to consider exactly what happened, how did it unfold. But this was particularly bad. This is somebody who invaded the house in the middle of the night. He shot an unarmed man. He went from there to attack other people in the house. So it was most serious. In fact, the trial court probably found that it was appallingly ferocious and that the nature of the defendant's attack was tenacious. And that conduct warranted the maximum sentence of natural life. And what do you make of Mr. Branstrader's argument about the trial judge's expression of a reluctance to impose the sentence? Well, I would agree with what Justice Hyman said, that if anything, it only proves that the judge really reasoned and took into consideration all the factors before it. And that's important. The judge didn't make a cut-and-dry decision. He knew all about the rehabilitation, and he made a considered decision. And as the court pointed out earlier today, the court expressed kind of dismay that this is a circumstance where a sentence like that had to be imposed, but said the court kept coming back to the fact that this was a horrific night of war, the defendant's conduct was tenacious and ferocious, and that it was important to protect the victim, one of the victims in this case, from ever having this man come through her window in the middle of the night again, which, of course, is something he attempted to do in the past as well. So under no circumstance could it be said that the court abused his discretion in imposing the sentence. It was a horrific crime, and the sentence of natural life was warranted. With regard to the defendant's psychological background, as the court pointed out earlier, at the very threshold of the argument, it fails, because we don't, in fact, know what the defense counsel did with regard to investigating the defendant's mental health. In fact, all the record shows is that defense counsel asked for continuance in the beginning of the case, because he wanted to look into the issue of what the record calls defendant's physical incapacity. What exactly that is, I don't know. The record doesn't say. But it certainly suggests that defense counsel took a good look at the defendant and investigated where he thought it was appropriate. So the argument fails at the outset for that very reason. There's nothing about the defendant in his history or in his conduct at trial that indicates he had mental health issues. He was employed. He was educated. He had relationships. There's nothing that indicates there was anything unusual about him during the course of defense counsel's representation. This man testified at trial. The court can read it and see that he was, although the story was not credible, he was totally coherent, totally coherent. So the value, the test of ineffective assistance of counsel is, what's the value of the evidence that was not presented? And in this case, it's nil. And lastly, with regard to the sentencing enhancement, under MIMES it's clear that when an indictment includes an alleged fact that extends the potential punishment beyond the maximum that would otherwise apply, defendant has a due process right to notice of what that fact would be. In this case, it's really very simple. The question becomes, if the defendant was charged with pulling the trigger of a firearm against the victim and the sentencing enhancement applies to one who was armed with a firearm during the offense, how could defendant possibly not have known that this sentencing enhancement applied? And defendant argued this morning that, well, what about the fact that the state expressly included the enhancement as to the other two charges, but not this? It doesn't matter. Under White- Would you agree that the better practice would be to include the sentencing enhancement language in every count to which the state contends it applies? It would be preferable, but the important point in terms of this argument is that, nonetheless, the defendant has a notice. He doesn't have any right under the Fifth Amendment to specific sentencing enhancement language in his indictment. He doesn't. All that's important is whether he knows the facts, that he knows that the alleged fact could be used to impose a sentencing enhancement. And there's no possibility the defendant didn't know. It's impossible to pull the trigger of a firearm without hearing it. Excuse me. Two more comments. In People v. White, the state and the defendant entered into a plea agreement where a sentencing enhancement was applicable, but the court did not apply it. And that case was reversed because the court said the trial courts must follow the legislature and impose sentencing enhancements where they apply. They apply here, so this plea agreement is void. And lastly, before I totally lose my voice, the issue of prejudice with regard to sentencing enhancement. Under Quadrato, a defendant who waits until after trial to challenge the adequacy of his indictment must show prejudice in the preparation of his defense. Here the defendant never indicated surprise with regard to the enhancement. He didn't file a motion to reconsider sentence. He argued in his brief that, well, if I had known about the sentencing enhancement, I might have asked for a Rule 451G hearing. I might have not testified. I might have asked for a jury trial. But honestly, the arguments are the equivalent of saying I might have done something differently. There's no specifics about what he would have done differently, what he would have said at a 451G hearing, how his testimony at a jury trial would have been different. It couldn't have been different if he stuck with his self-defense claim because in claiming self-defense he admitted that he was armed with a firearm. For these reasons, the people would ask that this court affirm the defendant's conviction and sentence. Thank you. There is no rebuttal. All right. Well, we'd like to thank you for your excellent briefs and argument. We will stand in recess and thank you again.